FILED

12 OCT 31 PM 4: 11

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY                    DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KENNETH ARTHUR ZIEMANN,** | Civil No.    11-cv-2496-BEN(KSC) |
| **Petitioner,** | **REPORT AND RECOMMENDATION** |
| | **OF UNITED STATES MAGISTRATE** |
| **vs.** | **JUDGE RE DENIAL OF PETITION** |
| | **FOR WRIT OF HABEAS CORPUS** |
| **B. M. CASH,  Warden,** | **[ECF No. 11]** |
| **Respondent.** | |

Kenneth Arthur Ziemann ("Ziemann"), a state prisoner proceeding pro se and in forma pauperis with a First Amended Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeks relief from his December 2007 conviction in San Diego County Superior Court Case No. SCD188611 of first degree murder. He is serving a sentence of life in prison without the possibility of parole, plus 10 years. The California Court of Appeal affirmed his conviction, and the California Supreme Court denied his petition for review. He unsuccessfully sought collateral relief at all three state court levels.

The parties do not dispute the Petition is timely, and Ziemann exhausted his federal claims in state court. Respondent opposes habeas relief on any of his six claims. (Ans. 2, ECF No. 19.)[1] Ziemann filed a Traverse. (ECF No. 22.) After review of the pertinent portions of the record, it is recommended that the Petition be **DENIED**, for the reasons discussed below.

---

[1]   Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

I.     **BACKGROUND**

Ziemann does not dispute the evidentiary summary provided by the California Court of Appeal in its unpublished decision affirming the judgment.  (Lodgment No. 6, <u>People v. Ziemann</u>, No. D053145 (Cal. Ct. App., Jun. 23, 2009), slip op.)  A presumption of correctness attaches to state court determinations of factual issues. 28 U.S.C. §2254(e)(1).

> In January 2000 James Sykes worked as a security guard for North Park Produce, a grocery in San Diego.  Sykes suggested robbing the grocery to a friend, Glenn Irvin.  Sykes told Irvin that the brothers who owned and worked at the grocery, Joseph and Abdul Nehme, typically closed the store around 7:00 o'clock each evening and took the proceeds from their sales home each night in grocery bags.  Irvin agreed to rob the brothers and enlisted Ziemann to assist him
>
> Irvin and Ziemann obtained a revolver from a friend, Keith Mahoney, for use in the robbery.  They also obtained dark clothes, gloves, beanie caps and dark nylon stockings to pull over their faces.
>
> On Saturday, January 22, Sykes left the grocery prior to closing, telling the Nehmes that he was going fishing.  Ziemann and Irvin arrived at the store shortly before closing and hid in the parking lot.
>
> As the Nehmes exited the store, Irvin and Ziemann, wearing dark clothing and nylon stockings on their faces, confronted them.  Irvin sprayed Joseph Nehme in the face with pepper spray and punched him.  Ziemann yelled at Abdul Nehme to give him the money and then shot him in the chest.  Ziemann and Irvin grabbed a grocery bag and fled the scene.  Abdul Nehme died of the gunshot wound, characterized by the medical examiner as a "single gunshot wound on the left side of his chest."

(Lodgment No. 6, slip op. at 2-3.)

At trial, Glenn Irvin was the key witness for the prosecution.  "Irvin testified that he and Ziemann committed the North Park Produce robbery and communicated the specifics of the robbery to the jury, including that Ziemann was the one who shot Abdul Nehme." (Lodgment No. 6, slip op. at 7.)  "[D]efense counsel's examination of Irvin is fairly characterized as charging that Irvin's testimony against Ziemann was fabricated, at least in part, to obtain the benefits of" a plea agreement for himself, and counsel "challenged [his] credibility on numerous grounds." (<u>Id.</u> at 11, 7.)  Defense counsel attempted "to demonstrate that the police investigation was biased and incompetent," but was somewhat impeded in presenting that theory by certain of the trial court's evidentiary rulings excluding some of his evidence.  (<u>Id.</u> at 22-24.)  Ziemann testified in his own defense offering, among other things, detailed alibi testimony corroborated by his wife that he was with her and their children at the time of the murder.  (Lodgment No. 2, RT vol. 9, pp. 1279-1280, 1336-1341.)

1    Ziemann was first interviewed by police about three days after the January 22, 2000 murder,

2    and a second time in early February 2004, a few weeks after he had gotten out of prison on other

3    charges. (Lodgment No. 2, RT vol. 9, pp. 1294-1296.) He denied that he personally participated in

4    or conspired to commit a robbery of the North Park Produce Store or discharged a firearm that killed

5    anyone that day. (Id., pp. 1294-1295, 1314.) He testified he knew Glen Irvin through his wife, but

6    their relationship was limited to doing drug deals for each other. (Id. pp. 1295-1296.) He testified he

7    went to Irvin's apartment near the North Park Produce store on Sunday, January 23, 2000 to meet his

8    friend Tammy Scott and to pick up something from Irvin, when he saw that there was police activity

9    around a taped-off crime scene there. (Id. pp. 1297-1298, 1323-1324.) The next day, he again met

10   Tammy at her apartment where they smoked marijuana. Ziemann admitted he told her then that he was

11   involved in the North Park Produce incident, as she had testified at the trial he told her, but he

12   contended he only did so because he wanted to appear to be a tough guy. (Id. pp. 1300-1301, 1325-

13   1326.) On both direct and cross-examination, he denied his involvement in the robbery and homicide,

14   but admitted that he had not tried to correct the purported lie he told Tammy to the contrary. (Id. pp.

15   1301-1302, 1326-1332.) Other witnesses from among Ziemann's drug crowd also testified he told

16   them at various times that he was involved in the crime.[2]

17        After a seven-day trial (Lodgment 1, CT vol. 4, pp. 900-922), the jury deliberated less than

18   three days before convicting Ziemann on December 6, 2007 of first degree murder (Cal. Penal Code

19   § 187, subd. (a)), with true findings that he inflicted great bodily injury on a person aged 60 years or

20   older (Cal. Penal Code § 1203.09(a)), he was armed with a firearm during the commission of the

21   offense (Cal. Penal Code § 12022(a)(1)), he personally used a firearm during the commission of the

22   offense (Cal. Penal Code §§ 1203.06(a)(1)), 12022.53(b)), and he committed the murder during the

23   _____

24   [2]  See, e.g., Lodgment No. 2, RT vol. 5, pp. 608-611: "Q: I now want to draw your attention to a
     conversation between you and Mr. Ziemann at your house when you were living in El Cajon [between 2000

25   and 2001]. Do you remember that? . . . Q:  Who was in the kitchen with you? A [by Kenneth Durham]: It was
     just me and K.Z. [referring to the defendant]. . . Q:  . . . Did Mr. Ziemann talk to you about the robbery that

26   occurred at North Park Produce? A: Yeah. Q: What did Mr. Ziemann tell you about his involvement in that
     robbery? A: That when some guy came out, he had to shoot the guy, or something to that effect. Q: Did Mr.

27   Ziemann tell you how, if anyone else, was with him during the robbery? A: That would be Glenn. Q: Is that
     Glenn Irvin? A: Yes. Q: What was it that Mr. Ziemann told you about, as far as why he shot the person?

28   A: As far as I know, because the guy came running out. Q: And did Mr. Ziemann tell you whether he shot him
     on purpose or whether it was an accident? A: He didn't say."

1   course of a robbery (Cal. Penal Code § 190.2(a)(17)).  (Lodgment No. 1, CT vol. 4, pp. 922-929;

2   Lodgment No. 2, RT vol. 11, pp. 1602-1603.)  The jury hung on two additional allegations, which the

3   court then dismissed pursuant to the People's motion.  (Lodgment No. 1, CT vol. 4, pp. 926-927.)

4   Ziemann admitted three prison priors (Cal. Penal Code § 667.5(b)).  (Lodgment No. 1, CT fol. 4, p.

5   927; Lodgment No. 2, RT vol. 11, pp. 1612-1613.)  The court struck the firearm enhancement

6   allegation pursuant to Cal. Penal Code § 1385.  (Lodgment No. 1, CT vol. 4, pp. 857, 935; Lodgment

7   No. 2, RT vol. 12, pp. 1724-1725.)  Before sentencing, Ziemann received a substitution of counsel to

8   prepare a new trial motion due to a breakdown in defense counsel's ability to communicate with his

9   client and because Ziemann had lost confidence in his attorney.  (Lodgment No. 2, RT vol. 12, pp.

10  1615-1646.)  He was sentenced on May 30, 2008, after denial of his new trial motion, to life in prison

11  without the possibility of parole for the special circumstance murder, plus a consecutive ten years for

12  personal firearm use. (Lodgment No. 1, CT vol. 4, p. 935; Lodgment no. 2, RT vol. 12, 1724-1726.)

13          Ziemann appealed his conviction, alleging:   (1) the trial court abused its discretion by

14  excluding evidence that he told police he would take a polygraph test to demonstrate his innocence;

15  (2) the trial court erred by allowing the prosecution to introduce several out-of-court statements by a

16  witness after the witness' credibility was impeached; (3) pre-indictment delay prejudiced his ability

17  to defend himself, in violation of due process; and (4) the trial court's exclusion of certain third party

18  evidence proffered to demonstrate that the police investigation was biased and incompetent violated

19  his constitutional right to present evidence in his defense.  The Court of Appeal rejected all four

20  grounds for relief, but remanded the case to address a one-year sentence enhancement issue, affirming

21  the judgment in all other respects.  (Lodgment No. 6, slip op. at 2, 31-32 (citation omitted).)

22  Ziemann's petition for review in the California Supreme Court raised only aspects of his challenge to

23  the trial court's evidentiary rulings on the admissibility of prior consistent or inconsistent statements

24  under California Evidence Code sections.  (Lodgment No. 7.)  The petition was summarily denied.

25  (Lodgment No. 8, People v. Ziemann, No. S175086 (Cal., Oct. 14, 2009).)

26          Ziemann filed a habeas petition in San Diego County Superior Court on March 5, 2010,

27  alleging the same four grounds for relief he had presented in his direct appeal and adding two new

28  claims:  (1) a warrantless police search of a storage unit violated his Fourth Amendment rights; and

1   (2) he was unaware of the potential maximum sentence he could receive when he declined to accept

2   a plea deal. (Lodgment No. 9.) In a reasoned decision filed April 30, 2010, the Superior Court denied

3   the petition in reliance on a state procedural rule prohibiting the use of habeas corpus as a second

4   appeal of matters that were raised and rejected on appeal, disposing of four of Ziemann claims, and

5   in reliance on the general rule that habeas corpus cannot serve as a substitute for appeal, disposing of

6   his two new claims because they could have been but were not raised on a timely appeal of the

7   judgment, and he presented no special circumstances warranting departure from those rules.

8   (Lodgment No. 10, In re Ziemann, No. HC19903 (Cal. Super. Ct., Apr. 30, 2010) slip op. at 1-2.) The

9   Court also identified deficiencies in the merits presentation of those claims. (Id. pp. 3-4.)

10      Ziemann presented the same six claims in a December 20, 2010 habeas petition to the

11   California Court of Appeal. (Lodgment No. 11.) That Court denied the petition in a reasoned opinion

12   filed January 12, 2011, relying on California law and evidentiary deficiencies. (Lodgment No. 12, In

13   re Ziemann, No. D058789 (Cal. Ct. App., Jan. 12, 2011), slip op.) On March 10, 2011, he raised the

14   same claims in a habeas petition to the California Supreme Court. (Lodgment No. 13.) That petition

15   was summarily denied on August 17, 2011. (Lodgment No. 14, In re Ziemann, No. S191326.) He

16   filed his federal habeas petition on October 27, 2011, superseded by his First Amended Petition on

17   January 19, 2012 ("Petition") containing all six claims disposed of in state court. (ECF Nos. 1, 11.)

18  **II.**     **DISCUSSION**

19       **A.**    <u>**Legal Standards For Federal Habeas Relief**</u>

20      A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

21   in custody pursuant to the judgment of a State court only on the ground he is in custody in violation

22   of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). On federal habeas

23   review, the "court does not review a judgment, but the lawfulness of the petitioner's custody

24   *simpliciter*." Coleman v. Thompson, 501 U.S. 722, 730 (1991). Federal habeas courts do not "re-

25   examine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 68, n.2

26   (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the

27   challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S.

28   74, 76, (2005); *see* Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does

1  not lie for errors of state law"); Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990) (federal courts "have

2  no authority to review a state's application of its own laws"); Park v. California, 202 F.3d 1146, 1149-

3  50 (9th Cir. 2000) (same).

4          The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Ziemann's

5  claims because he filed his federal habeas petition after that statute's 1996 effective date. Lindh v.

6  Murphy, 521 U.S. 320, 322-23 (1997). AEDPA imposes a "'highly deferential standard for evaluating

7  state-court rulings,'" requiring "that state-court decisions be given the benefit of the doubt." Woodford

8  v. Visciotti, 537 U.S. 19, 24 (2002), quoting Lindh, 521 U.S. at 333 n.7. Federal habeas corpus is a

9  "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary

10  error correction through appeal." Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 786 (2011),

11  quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring). "As a condition

12  for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling

13  on the claim being presented in federal court was so lacking in justification that there was an error well

14  understood and comprehended in existing law beyond any possibility for fairminded disagreement."

15  Id. at 786-87. "AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus

16  review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S.

17  __, 130 S.Ct. 1855, 1866 (2010).

18          "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court,

19  subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Richter, 131 S.Ct. at 784. Habeas relief

20  is available under the first exception if the state court result "was contrary to, or involved an

21  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

22  the United States." 28 U.S.C. § 2254(d)(1); see Lockyer v. Andrade, 538 U.S. 63, 73-76 (2003). "A

23  state court decision is 'contrary to'" clearly established precedent if it "'applies a rule that contradicts

24  the governing law set forth in our cases' or if it 'confronts a set of facts that are materially

25  indistinguishable from a decision of this Court and nevertheless arrives at a result different from our

26  precedent.'" Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam), quoting Williams v. Taylor, 529 U.S.

27  362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable

28  application" test). To be found an "unreasonable application" of the precedent, the state court decision

1   must be "more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' " Wiggins

2   v. Smith, 539 U.S. 510, 520-21 (2003) (citations omitted). "[W]hen a Supreme Court decision does

3   not 'squarely address[]' the issue . . . it cannot be said, under AEDPA, there is 'clearly established'

4   Supreme Court precedent addressing the issue," and the federal court "must defer to the state court's

5   decision." Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009); see Carey v. Musladin, 549 U.S. 70, 77

6   (2006) (the lack of holdings from the Supreme Court on the issue presented precludes relief under 28

7   U.S.C. § 2254(d)(1)).    "Circuit precedent may provide 'persuasive authority' for purposes of

8   determining whether a state court decision is an 'unreasonable application' of Supreme Court

9   precedent", but "only Supreme Court holdings are binding on state courts, and 'only those holdings

10   need be reasonably applied.' " Rodgers v. Marshall, 678 F.3d 1149, 1155 (9th Cir. 2012) (citation

11   omitted); see Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005). "[R]eview under 28 U.S.C. §

12   2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the

13   merits." Cullen v. Pinholster, 563 U.S. __, 131 S.Ct. 1388, 1398 (2011).

14        Relief is available under the second AEDPA exception only if the state court result "was based

15   on an unreasonable determination of the facts in light of the evidence presented in the State court

16   proceeding." 28 U.S.C. § 2254(d)(2). "Factual determinations by state courts are presumed correct

17   absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the

18   merits in a state court and based on a factual determination will not be overturned on factual grounds

19   unless objectively unreasonable in light of" that evidence. Miller-El v. Cockrell, 537 U.S. 322, 340

20   (2003) "The question under AEDPA is not whether a federal court believes the state court's

21   determination was incorrect but whether that determination was unreasonable -- a substantially higher

22   threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

23        Federal habeas courts apply AEDPA standards to "the last reasoned decision" by a state court

24   addressing the merits of the claim. Campbell, 408 F.3d at 1170; see also Ylst v. Nunnemaker, 501

25   U.S. 797, 803 (1991). An unexplained denial of a habeas petition by the California Supreme Court

26   is entitled to AEDPA deference as an adjudication on the merits of the federal claims presented unless

27   "there is reason to think some other explanation for the state court's decision is likely." Richter, 131

28   S.Ct. at 785; see Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992). In deciding whether relief

1  from an unconstitutional trial error is warranted, federal courts apply the standard from <u>Brecht v.</u>

2  <u>Abrahamson</u>, 507 U.S. 619, 623 (1993) "uniformly in all federal habeas corpus cases under § 2254."

3  <u>Bains v. Cambra</u>, 204 F.3d 964, 977 (9th Cir. 2000); *see* <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22 (2007)

4  (holding "that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error

5  in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht,*

6  *supra,* whether or not the state appellate court recognized the error and reviewed it for harmlessness

7  under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*, 386 U.S. 18").

8  ### B.   Evidentiary Hearing

9      In his Traverse, Ziemann "asserts that an evidentiary hearing is required to resolve factual

10  disputes material to the claims raised in his petition," citing Habeas Corpus Rule 8(a). (Traverse 4,

11  ECF No. 22; <u>id.</u> pp. 5, 9.)  AEDPA "substantially restricts the district court's discretion to grant an

12  evidentiary hearing," and prescribes the manner in which federal courts must approach the factual

13  record. <u>Baja v. Ducharme</u>, 187 F.3d 1075, 1077 (9th Cir. 1999); <u>Cullen</u>, 131 S.Ct at 1400-01 ("Section

14  2254(e)(2) imposes a limitation on the discretion of federal habeas courts to take new evidence in an

15  evidentiary hearing"). "[A] determination of a factual issue made by a State court shall be presumed

16  to be correct," with the "applicant [having] the burden of rebutting the presumption of correctness by

17  clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In addition, "[b]ecause a federal court may

18  not independently review the merits of a state court decision without first applying the AEDPA

19  standards, a federal court may not grant an evidentiary hearing without first determining whether the

20  state court's decision was an unreasonable determination of the facts." <u>Earp v. Ornoski</u>, 431 F.3d

21  1158, 1166-67 (9th Cir. 2005), *citing* <u>Lockyer</u>, 538 U.S. at 71; *see* <u>Schriro</u>, 550 U.S. at 474 ("Because

22  the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court

23  must take into account [the § 2254] standards in deciding whether an evidentiary hearing is

24  appropriate"). "In practical effect, . . . this means that when the state-court record 'precludes habeas

25  relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary

26  hearing.' " <u>Cullen</u>, 131 S.Ct. at 1401, 1399, *quoting* <u>Schriro</u>, 550 U.S. at 474.

27      "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must

28  overcome the limitation of § 2254(d)(1) on the record that was before that state court." <u>Cullen</u>, 131

1    S.Ct. at 1400 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review" to

2    determine whether a claim adjudicated by the state court was contrary to or involved an unreasonable

3    application of clearly established federal law). If a claim subject to 28 U.S.C. § 2254(d)(1) "does not

4    satisfy that statutory requirement, it is "unnecessary to reach the question whether § 2254(e)(2) would

5    permit a [federal] hearing on th[at] claim."[3] Id., quoting Williams, 529 U.S. at 444.

6         For the reasons discussed below, this Court recommends a finding that none of Ziemann's

7    claims warrants federal habeas relief pursuant to 28 U.S.C. § 2254(d)(1). By its terms, 28 U.S.C.

8    § 2254(d)(2) restricts federal habeas review to the state court record. Ziemann's showing does not

9    overcome the AEDPA limitations restricting federal habeas review to the evidentiary record that was

10   before the state courts. 28 U.S.C. § 2254(e); see Cullen, 131 S.Ct. at 1401, 1399-1400, n.5. As he

11   does not satisfy the exacting AEDPA standards prerequisite to receiving an evidentiary hearing, his

12   request should be **DENIED**.

13   **C.      Ground One:  Exclusion Of Offer To Take A Polygraph Test Evidence**

14        Ziemann contends that the trial court erred "by precluding evidence that Petitioner had

15   consented to a police request that he take a polygraph test." (Pet. 6, ECF No. 11.) He summarily

16   argues "the court's ruling deprived Petitioner of an essential element pointing unerringly to his actual

17   innocence," because "[h]ad the jury been allowed to hear this evidence, Petitioner asserts that a

18   different result would have resulted." (Traverse 10, ECF No. 22.) However, no test was administered,

19   and Ziemann overstates the import of his purported willingness to participate.

20        At trial, [Ziemann] sought to introduce evidence that the investigators had
          urged him to take a polygraph to support his claim of innocence and that he had, in
21        fact, agreed to take the test, only to have the investigators then decline to go any further
          with their suggestion in this regard. The court sustained the People's objection under
22        Evidence Code section 351.1, subdivision (a), which makes inadmissible "any
          reference to an offer to take, failure to take, or taking of a polygraph examination."
23        [Ziemann] contends that on the particular facts of this case, the exclusion of this
          evidence deprived him of due process as well as right [sic] to present a defense at the
24        guilt phase of his trial. Furthermore, by its very words, section 351.1 did not apply to
          appellant's acquiescence to the police request.

25   _____

26   [3] As pertinent here, "[i]f the applicant has failed to develop the factual basis of a claim in State court
     proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . .
27   the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise
     of due diligence and . . . the facts underlying the claim would be sufficient to establish by clear and convincing
28   evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of
     the underlying offense." 28 U.S.C. § 2254(e)(2).

11cv2496-BEN(KSC)

1    (Pet. 39, ECF No. 11.)

2           Relying solely on state law and reviewing the claim under an abuse of discretion standard, the

3    Court of Appeal rejected this claim after summarizing the context in which the issue arose. (Lodgment

4    No. 6, slip op. at 4-7)

5                 Shortly after the murder, police questioned Ziemann as a possible suspect.
           When Ziemann denied any involvement, the police asked if he would take a polygraph
6          examination.  Ziemann agreed to do so, but the police did not pursue the offer.  In
           responding to a pretrial motion to exclude this evidence, defense counsel argued that
7          Ziemann's willingness to take a polygraph was relevant and admissible to show his
           innocent "state of mind" and that the investigators' failure to follow through with the
8          exam demonstrated "prejudice and bias in how this investigation was done."  Counsel
           also urged the court to wait to hear the prosecution's case before ruling on the motion;
9          the trial court agreed to do so.

10                Later, during trial, Ziemann's counsel renewed his request, asking the trial court
           to allow Ziemann to testify that he told police, " 'I will do whatever it takes to clear
11         myself.  I will take a lie detector test,' [and] they declined."  Counsel specifically
           highlighted the testimony of a prosecution witness who explained that he had
12         mentioned Ziemann's involvement in the robbery after the police disbelieved his initial
           statements.  The witness stated, "The[] [police] told me they didn't believe my story;
13         that they wanted to know if I would agree to a polygraph, and they told me I could have
           a couple of days to think about it."  The trial court ruled that despite the prosecution
14         witness's spontaneous reference to a request to take a polygraph test, the evidence of
           Ziemann's agreement to take such a test was inadmissible under Evidence Code section
15         351.1.

16   (Lodgment No. 6, slip op. at 3-4 (footnote omitted).)

17          The Court of Appeal determined the trial court did not err in excluding evidence that Ziemann

18   offered "to take a polygraph test after the investigating officer's suggestion that he do so," because that

19   evidence "falls squarely within the 'firm and broad exclusion' of [Cal. Evid. Code] section 351.1."

20   (Lodgment No. 6, slip op. at 5-6, *citing* People v. Basuta, 94 Cal.App.4th 370, 390 (2001); People v.

21   Hinton, 37 Cal.4th 839, 890 (2006) (rejecting a constitutional challenge to a trial court's exclusion of

22   "evidence that [the defendant] agreed to the district attorney's request to submit to a polygraph

23   examination" on grounds "[a] per se rule excluding polygraph evidence is a 'rational and proportional

24   means of advancing the legitimate interest in barring unreliable evidence' ") (citation omitted); People

25   v. Samuels, 36 Cal.4th 96, 128 (2005).  Finding the Evidence Code establishes a "clear and

26   unambiguous prohibition" covering all polygraph-related evidence, the court determined it could not

27   conclude the trial court abused its discretion in excluding the evidence. (Lodgment No. 6, slip op. at

28   7, 6: "Section 351.1 does not limit its broad preclusion to certain uses of polygraph evidence; rather,

11cv2496-BEN(KSC)

1    it precludes *any* evidence regarding polygraph tests"). For purposes of federal habeas relief, the

2    "correctness of the trial court's evidentiary ruling as a matter of state law is irrelevant;" the only

3    question is whether the ruling "rendered the trial so fundamentally unfair as to violate due process."

4    <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1065 (9th Cir. 2008) (citation omitted).

5         The state courts did not discuss the constitutional basis for the claim that Ziemann also

6    advanced. (*See* Lodgment Nos. 6, 10, 12.) When the state court reaches the merits of a claim but

7    provides no reasoning to support its conclusion, "although we independently review the record, we still

8    defer to the state court's ultimate decision;" in the alternative, "when it is clear that a state court has

9    not reached the merits of a properly raised issue," a federal habeas court reviews it de novo but still

10   defers to state court factual determinations unless rebutted by clear and convincing evidence. <u>Pirtle</u>

11   <u>v. Morgan</u>, 313 F.3d 1160, 1167-68 (9th Cir. 2003). Ziemann argues:

12            Furthermore, the error in this case is not only one of state law, but it is one of
             federal constitutional law as well, for if there is any principle that is sacrosanct, it is
13           that a defendant has a constitutional right, under the Fifth, Sixth and Fourteenth
             Amendments, to due process and to a fair trial, i.e., to present a defense. The
14           preclusion of appellant's agreement to take a polygraph test was such a violation in this
             instance. . . . [¶] [A]ppellant submits that the preclusion of evidence indicating he
15           agreed under police prodding that he take a polygraph test as a means of corroborating
             (or not) his alibi most certainly contributed to the jury's verdict of first degree murder.
16           Because the lack of prejudice cannot be shown with the near certainty required,
             reversal is required under the *Chapman* [*v. California*, 386 U.S. 18 (1967)] standard
17           as well.

18   (Pet. 44-45, ECF No. 11; *see* Lodgment No. 3, Appellant's Opening Brief, p. 31-32.)

19        "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a

20   complete defense.' " <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (citation omitted); *see* <u>Moses</u>, 555

21   F.3d at 757 (the right to present a complete defense "stems both from the right to due process provided

22   by the Fourteenth Amendment . . . and from the right 'to have compulsory process for obtaining

23   witnesses in his favor' provided by the Sixth Amendment") (citations omitted). However,

24   "countervailing public interests" qualify trial rights. <u>Taylor v. Illinois</u>, 484 U.S. 400, 414 (1988);

25   <u>Moses</u>, 555 F.3d at 757 (" 'a defendant's right to present relevant evidence is not unlimited, but rather

26   is subject to reasonable restrictions,' such as evidentiary and procedural rules"), *quoting* <u>United States</u>

27   <u>v. Scheffer</u>, 523 U.S. 303, 308 (1998) ("state and federal rulemakers have broad latitude under the

28   Constitution to establish rules excluding evidence from criminal trials"). "Such rules do not abridge

1   an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the

2   purposes they are designed to serve.' " <u>Scheffer</u>, 523 U.S. at 308, 309-15 (citations omitted)

3   (discussing the several legitimate interests served by a rule excluding all reference to and results of

4   polygraph examinations, and determining that a per se evidentiary rule to that effect does not abridge

5   a defendant's right to present a defense).

6        When evidence is excluded through the valid application of a state evidentiary rule, a due

7   process violation requires a showing that the excluded evidence was sufficiently trustworthy and

8   crucial to the defense. <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973). No such compelling

9   circumstance attaches to Zeimann's contention he told police, after their "prodding," that he would

10   "agree" to take a polygraph test. The jury had ample opportunity to hear his defense and to assess his

11   credibility through his trial testimony. The state court result on this issue comports with controlling

12   United States Supreme Court authority, and relief on Ground One should be **DENIED**.

13      **D.**     <u>**Ground Two: Admission Of Witness' Out-Of-Court Statements**</u>

14        Ziemann argues as Ground Two that the trial court erred by allowing the prosecution to

15   introduce several out-of-court statements witness Glenn Irvin made to witnesses after the credibility

16   of Irvin's trial testimony was impeached. In challenging the admission of "the considerable hearsay

17   evidence as to what Irvin told other individuals concerning the robbery, and more particularly, about

18   [Ziemann's] involvement" in the robbery and murder (Pet. 47, ECF No. 11), he argues that the trial

19   court erred in its application of Cal. Evid. Code § 791 and of Cal. Evid. Code § 1236. Section 791

20   provides, in pertinent part: "Evidence of a statement previously made by a witness that is consistent

21   with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: . . .

22   (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated

23   or is influenced by bias or other improper motive, and the statement was made before the bias, motive

24   for fabrication, or other improper motive is alleged to have arisen." Section 1236 provides: "Evidence

25   of a statement previously made by a witness is not made inadmissible by the hearsay rule if the

26   statement is consistent with his testimony at the hearing and is offered in compliance with Section 791.

27         The People's star witness in this case was one time co-defendant, now turned
state's witness, Glenn Irvin. The record makes clear that from the very getgo, Irvin lied

28   as to his involvement in the North Park robbery/murder. In fact, by his own admission,

1   he orchestrated a fabricated alibi with his live-in girlfriend Shannon Carman
    immediately after the robbery. (4RT347.) . . . [¶] In the several interviews Irvin had
2   subsequently had over the course of the next seven years, he gave conflicting and false
    stories as to his involvement in the robbery, as to what actually transpired leading up
3   to the robbery, and as to how the robbery went down. Virtually the only consistent
    aspect of his many versions of what took place, and even that was not consistent, was
4   that [Ziemann] took part in the robbery and it was [Ziemann] who shot the store owner.

5   (Pet. 46-47, ECF No. 11.)

6          Ziemann argues in his federal Petition (which incorporates the points and authorities submitted

7   in support of his direct appeal) that the trial court's handling of the evidence of Irvin's statements to

8   a number of prosecution witnesses who repeated what Irvin told them resulted from misapplication

9   of Cal. Evid. Code §§ 791 and 1236. (*See* Pet. 48, ECF No. 11 (contesting the trial court's admission

10  of "testimony of Shannon Carman, Estor Simon, Rachel Espanol and Jarred Matthews as to what Irvin

11  told them concerning the North Park Produce robbery" and the court's acceptance of "the prosecutor's

12  claim that any motive Irvin had to lie (so as to render the various hearsay statements admissible) arose

13  when he made his deal with the District Attorney's Office to a stipulated term of 27 years on February

14  2007"); *see* id. 48-52.) In consideration of its thorough analysis of those state code provisions and the

15  trial record (Lodgment No. 6, slip op. at 7-16) and applying an abuse of discretion standard of review,

16  the Court of Appeal concluded:

17          The prior statements exhibited sufficient consistency with Irvin's trial testimony
            to qualify as prior "consistent" statements under sections 791 and 1236. The central
18          contention of Irvin's trial testimony was that he and Ziemann robbed North Park
            Produce and that, during the robbery, Ziemann shot Abdul Nehme. In cross-
19          examination, Ziemann's counsel tried to show that this specific contention was not
            credible (in part, because Irvin was only cooperating in Ziemann's prosecution to obtain
20          the benefit of a plea agreement). Irvin's statements, before entering the plea, that he
            and Ziemann robbed North Park Produce and Ziemann shot the victim when the
21          robbery went bad, were "consistent" with his trial testimony.

22  (Lodgment No. 6, slip op. at 15; "In short, any argument that the totality of admissible statements

23  demonstrated that Irvin lacked credibility did not go to the admissibility of the prior consistent

24  statements, but to their weight" (Id. at 16).)

25          This Court is bound by the state courts' interpretation of state law and must defer to the state

26  court's reasonable factual findings. Bradshaw, 546 U.S. at 76. Ziemann's attempt to demonstrate that

27  evidentiary rules were incorrectly applied has no bearing on his entitlement to relief. Larson, 515 F.3d

28  at 1065 ("The correctness of the trial court's evidentiary ruling as a matter of state law is irrelevant;"

1   the ruling must have "rendered the trial so fundamentally unfair as to violate due process").

2        Ziemann also argues: "Because of their inherent and transparent untrustworthiness, Irvin's

3   prior hearsay statements do not withstand Sixth Amendment scrutiny and should have been ruled

4   inadmissible on that basis as well." (Pet. 63, ECF No. 11, invoking "the Confrontation Clauses of the

5   federal and state Constitutions.") He relies on the federal cases <u>White v. Illinois</u>, 502 U.S. 346, 357

6   (1992) (upholding the admission of the out-of-court statements of a child victim under certain hearsay

7   exceptions without requiring the prosecution to produce the victim at trial or requiring the trial court

8   to make a finding of witness unavailability) and <u>Idaho v. Wright</u>, 497 U.S. 805, 814-16, 818, 820-21

9   (1990) (applying a totality of the circumstances test of trustworthiness to out-of-court statements made

10  by a non-testifying child abuse victim in the Confrontation Clause context to find the statements lacked

11  sufficient indicia of reliability to overcome hearsay exclusion) for the proposition that hearsay

12  "evidence is presumed unreliable and must be excluded absent a showing of particularized guarantees

13  of trustworthiness such that adversarial testing would be expected to add little, if anything, to the

14  statement's reliability." (Pet. 64, ECF No. 11.)  However, his argument ignores the distinguishing

15  circumstance that the hearsay statements admitted through other witnesses at Ziemann's trial were

16  made by Glenn Irvin, himself a testifying witness at Ziemann's trial available for "adversarial testing."

17  The Court of Appeal rejected Ziemann's argument that "the error in admitting the numerous instances

18  of Irvin's prior hearsay statements [prejudicially] violated [his] constitutional confrontation clause

19  rights" (Pet. 66, ECF No. 11) on that basis.  As the Court stated:

20           Finally, Ziemann contends that the admission of the statements, even if proper
             under sections 791 and 1236, violated his Sixth Amendment right to "be confront[ed]
21           with the witnesses against him." (U.S. Const., 6th Amend.) This contention is without
             merit.  "[W]hen the declarant appears for cross-examination at trial, the [Sixth
22           Amendment's] Confrontation Clause places no constraints at all on the use of his prior
             testimonial statements." (*Crawford v. Washington* (2004) 541 U.S. 36, 59.) Here,
23           Irvin testified at trial and was available to "defend or explain" his prior statements.
             (*Ibid.*)  Consequently, there can be no claim that the admission of his prior statements
24           violated the Sixth Amendment. (*Ibid.* ["The Clause does not bar admission of a
             statement so long as the declarant is present at trial to defend or explain it."].)
25
    (Lodgment No. 6, slip op. at 16; *see also* <u>California v. Green</u>, 399 U.S. 149 (1970).)
26
         Respondent observes that Ziemann fails to demonstrate how the trial court's ruling had the
27
    effect of rendering his trial fundamentally unfair, particularly in light of defense counsel's "vigorous"
28

                                          14

1    cross-examination of Irvin to expose any potential bias or fabrication in his testimony based on the

2    plea agreement. (Ans. 15, ECF No. 19-1; *see* Lodgment No. 2, RT vol. 4, pp. 356-415.) The Court

3    should find the state court result comports with controlling federal authority and is objectively

4    reasonable and should **DENY** relief on Ground Two.  28 U.S.C. § 2254(d).

5              **E.        Ground Three:  Pre-Indictment Delay**

6              "A prosecutor must have wide latitude to decide when to seek an indictment, especially when

7    [as here] a case involves more than one person." United States v. Sherlock, 962 F.2d 1349, 1355 (9th

8    Cir. 1989), *citing* United States v. Lovasco, 431 U.S. 783, 792-95 (1977). The Sixth Amendment right

9    to a speedy trial does not attach until a suspect is formally charged or arrested, but the potential

10   prejudicial effect of delays in charging a suspect are subject to scrutiny under the Due Process Clause.

11   United States v. MacDonald, 456 U.S. 1, 7 (1982).  "[P]roof of actual prejudice makes a due process

12   claim concrete and ripe for adjudication," but prejudice alone does not "make[] the claim automatically

13   valid." Lovasco, 431 U.S. at 789, 792-96 (finding that "proof of prejudice is generally a necessary but

14   not sufficient element" to prevail on a denial of due process claim caused by excessive pre-indictment

15   delay, declining to adopt a rule requiring prosecutors to make charging decisions at any particular point

16   during an investigation).  "[T]o prosecute a defendant following investigative delay does not deprive

17   him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.".

18   Id.

19             "[T]he due process inquiry must consider the reasons for the delay as well as the prejudice to

20   the accused." Lovasco, 431 U.S. at 790 (1977); *see* United States v. Sherlock, 962 F.2d 1349, 1353-54

21   (9th Cir. 1989).  As noted by the Court of Appeal in addressing this claim on the merits, "the test is

22   the same" under either the Fifth or the Sixth Amendment, "i.e., any prejudice to the defendant resulting

23   from the delay must be weighed against the justification for the delay." (Lodgment No. 6, slip op. at

24   18 (citation omitted).)  However, only if the claimant first shows actual prejudice does the court need

25   to balance the length of delay against the government's reason for the delay to ensure the delay did not

26   violate "fundamental conceptions of justice." Lovasco, 431 U.S. at 790.  "The defendant has a heavy

27   burden to prove that a preindictment delay caused actual prejudice: the proof must be definite and not

28   speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is

                                                      15

1  prejudicial to his case." United States Moran, 759 F.2d 777, 782 (9th Cir. 1985) (citations omitted).

2       The robbery and murder in this case occurred on January 22, 2000. Ziemann was not charged

3  until February 2005. He was tried for the crimes in late 2007. He contends "he was denied his right

4  to due process by the unjustified and negligent delay between the time of the offense and the filing of

5  the complaint against him." (Pet. 69, ECF No. 11.) He identifies as the prejudicial consequences of

6  that delay that "he had alibi witnesses whose memories as to a specific night in 2000 could only have

7  faded such that rendered [sic] his defense in 2007 problematic beyond redemption[, and] . . . two

8  witnesses who claimed to have been told by a third party that he (the third party in question) had

9  committed the offense, died prior to trial, . . . thereby making both witnesses unavailable." (Id. pp. 69-

10  70.) He cites Barker v. Wingo, 407 U.S. 514, 532 (1972) for the proposition "prejudice may be shown

11  by the loss of material witness [sic] or other missing evidence of fading memory caused by lapse of

12  time." (Traverse 12, ECF No. 22.) The Barker Court, deciding a Sixth Amendment claim raised in

13  connection with a delay in excess of five years between arrest and trial, identified and applied four

14  interrelated factors in a balancing test to hold that where the defendant was not seriously prejudiced

15  by that delay, the defendant's speedy trial right was not violated.

16       Ziemann testified that he and his wife were questioned on February 3, 2000 about the January

17  22, 2000 homicide. (Lodgment No. 2, RT vol. 9, p. 1275.) In 2002, the police received information

18  supplying them with names of persons "said to be responsible for the crime," including his own. (Pet.

19  69, ECF No. 11.) "[I]t took a full five years to lodge a complaint against appellant, and this even after

20  they had been given a tip immediately after the offense that appellant had been involved in the

21  incident, and even after co-conspirator Glenn Irvin offered in 2002 to give a full accounting of the

22  commission of the offense, an opportunity police investigators for some reason chose to ignore." (Pet.

23  73-74, ECF No. 11; see Lodgment No. 2, RT vol. 4, pp. 359-377.)

24       For some inexplicable reason, the police did not act upon those revelations at that time.
     Then in November of 2004, two years later, that same source once again informed the

25       police that he could provide the names of the perpetrators and in a freetalk that
     subsequently took place in December of 2004, this source (Glenn Irvin) gave a

26       substantial accounting as to how he and [Ziemann] committed the crime in question.
     This information notwithstanding, a complaint was not lodged against appellant until

27       February 10, 2005, and trial did not commence until the end of 2007.)

28  (Pet. 69, ECF No. 11.) The Court of Appeal summarized the procedural and substantive posture of

the claim:

> After the jury verdict, Ziemann brought a motion for a new trial alleging, among other things, the denial of Ziemann's "right to a speedy trial." The motion noted that while the offense occurred on January 22, 2000, the complaint charging Ziemann was not filed until February 10, 2005. In an attempt to demonstrate the requisite prejudice from the delay, the motion states:
>
>> "[T]he defendant asserts that his alibi defense was substantially impaired by the prosecution's failure to bring the case to trial in a more timely fashion. Specifically, alibi witnesses['] recollection were [sic] imprecise because of the passage of time and some alibi witnesses could not recall the incident which happened so many years previously. The defendant asserts that his family members, and perhaps others, would have provided more precise and detailed alibi testimony had the trial been brought in a timely manner."
>
> The trial court held a hearing on the motion at which it rejected the speedy trial challenge on the sole ground that Ziemann failed to demonstrate "actual prejudice" from the five-year delay.

(Lodgment No. 6, slip op. at 17 (footnote omitted).)

The appellate court clarified that Ziemann acknowledged on appeal that "his claim 'must be scrutinized under the Due Process Clause, not the Speedy Trial Clause' " because the latter protection does not arise until a defendant is formally charged. (Lodgment No. 6, slip op. at 18, *quoting* MacDonald, 456 U.S. at 7 ("no Sixth Amendment right to a speedy trial arises until charges are pending").) The court applied the same controlling principles as those mandated under federal authority. The court concluded "Ziemann's contention that the five-year delay deprived him of certain alibi testimony is sheer speculation and we, thus, cannot disturb the trial court's finding that Ziemann failed to demonstrate actual prejudice."[4] (Lodgment No. 6, slip op. at 22 & n.11 ("As we conclude that the trial court's finding regarding prejudice is adequately supported by the record, we need not evaluate the justification, if any, for the delay") (citation omitted)); *see* Lovasco, 431 U.S. at 790. The court

---

[4] In determining that Ziemann failed to support his argument with particular facts, the Court of Appeal noted "there is nothing in the trial record to support Ziemann's conclusory assertion that the delay interfered with his or his wife's ability to recall their whereabouts at the time of the offense," as demonstrated in their trial testimony when both specifically recalled their "precise whereabouts and activities on the day of the offense." (Lodgment No. 6, slip op. at 21.) His wife stated then that she specifically recalled those details because "[t]wo detectives came to our house approximately ten days later and asked us where we were on that night, [so they] had to recall and remember exactly the events of that day." (Id.) The court distinguished Ziemann's circumstances from those of defendants whose ability to reconstruct their activities at some specific time and place is impeded by lengthy precharging delays that deprive them of preparations for a defense to a future prosecution because they do not know when or how police believed the crime was committed. In contrast, "Ziemann was aware approximately one week after the offense that the police suspected him of involvement in a specific murder that occurred at a specific time and place." (Id. at 20-21.)

1    observed that "Ziemann was aware approximately one week after the offense that the police suspected

2    him of involvement in a specific murder that occurred at a specific time and place," and that Ziemann's

3    and his wife's recollections were precise and uncompromised by the passage of time, defeating a

4    showing of prejudice from the pre-charging delay. (Lodgment No. 6, slip op. at 20-22; *see* Lodgment

5    No. 2, RT vol. 9, pp. 1280, 1336-1341; RT vol. 8, pp. 1174-1179.)

6         With respect to other witnesses, the court determined "Ziemann fails . . . to specifically identify

7    any other witness who would have corroborated his alibi, but for the passage of time," and he relied

8    solely on conclusory speculation for that argument. (Lodgment No. 6, slip op. at 21-22; *see* Pet. 73,

9    ECF No. 11: "Ultimately, appellant was in a most precarious position, for *had he called* the witnesses

10   to testify and *had they been unable to recall* the precise night in question . . . [Ziemann's] defense

11   *would have taken* a devastating hit") (emphasis added).)   Similarly, Respondent emphasizes that

12   Ziemann's argument "that the delay may have resulted in faded memories that might have helped his

13   alibi defense" represents mere conjecture, and "[o]utside of this conjecture, Ziemann offered nothing

14   to establish actual, non-speculative, demonstrable prejudice." (Ans. 26, ECF No. 19-1.)

15        The Court of Appeal expressly declined to consider the additional prejudice argument Ziemann

16   raised that two witnesses "who reportedly heard a third party [Charles Felder] admit to having

17   committed the crime" died shortly before trial because "Ziemann failed to raise this contention in

18   support of the motion in the trial court and thus we cannot properly consider it as a ground for

19   reversing the trial court's ruling." (Lodgment No. 6, slip op. at 21 n.10) The court nonetheless found

20   "that so far as the record suggests that the witnesses died well after Ziemann was charged, their

21   unavailability at trial could not solely be attributed to the prosecution's delay," further noting that his

22   new trial motion had "acknowlege[d] that during this time period, the defendant made no demand for

23   a speedy trial and in fact continually waived time for appeal." (Id. at 21 (internal quotation marks

24   omitted).)

25        Ziemann's challenge to the exclusion of the deceased witnesses' hearsay statements is discussed

26   in connection with Ground Four, below.  It is recommended the Court **DENY** relief on his Ground

27   Three theory of prejudicial pre-indictment delay because the record supports the state courts'

28   determination the delay caused Ziemann no material prejudice nor denial of a fair trial, and his United

1 States Supreme Court authority does not require a different result.  28 U.S.C. § 2254(d).

2     **F.**    **Ground Four: Erroneous Exclusion Of Evidence**

3     Ziemann argues his right to present a complete defense was impaired by certain of the trial

4 court's evidentiary rulings.  He complains that he "sought to introduce certain statements by various

5 declarants, evidence that would have supported his claim of innocence," and alleges the court wrongly

6 concluded "that the statements were hearsay and there was no exception through which they were

7 rendered admissible."  (Pet. 83, ECF No. 11.)  He "claimed bias on the part of the District Attorney's

8 Office and sought to prove that bias by pointing out that vital information was given to the

9 investigators which was ignored or not acted upon," exacerbating "the police delay in their

10 investigation of the offense in question" where "they engaged in virtually no investigation whatsoever

11 as to other possible suspects, even though there was strong evidence pointing to someone other than

12 appellant as the perpetrator."  (Id.) The Court of Appeal summarized the evidentiary exclusions

13 Ziemann challenges as follows:

14       First, the trial court excluded a statement made to police by an 80-year old
woman, Pauline Adams (who died prior to trial), that she heard Charles Felder admit
15 to committing the offense.  After hearing defense counsel's proffer regarding this
evidence, the trial court excluded it as "rank hearsay." The court emphasized, however,
16 that the proposed line of inquiry – police incompetence and bias in the investigation
– was otherwise proper and defense counsel could ask the police officers involved in
17 the case about leads they received and the degree to which they pursued those leads.

18       Second, the defense sought to admit the testimony of an investigator who would
testify that he interviewed Pamela Kelly, who also stated that she heard Charles Felder
19 admit his involvement in the robbery and murder.  Felder further relayed to Kelly
details about the robbery, such as why Felder shot the victim. Kelly, like Adams, had
20 since died.  The trial court excluded the statement as hearsay. Again, however, the trial
court emphasized that defense counsel could ask police officers about any leads they
21 received and their follow-up investigation with respect to those leads.

22       Third, and finally, Ziemann argues that the trial court erred in its "refusal to
allow appellant to elicit evidence that the police initially sent out a department-wide
23 communiqu[e] specifying that the suspects in the North Park robbery were [B]lack
males."  Ziemann argues that the trial court erroneously excluded this evidence as
24 hearsay, and the error was prejudicial because the evidence "was relevant to underscore
[Ziemann's] claim of police bias."
25
(Lodgment No. 6, slip op. at 23-24.)
26
27     The Court of Appeal first corrected a misrepresentation in Ziemann's presentation of this

claim: "[O]ne of the pieces of evidence that Ziemann complains was excluded was, in fact admitted,"
28

1    disposing of the third category of evidence enumerated above. (Lodgment No. 6, slip op. at 24: a

2    police officer called for the defense "testified that shortly after the murder, he sent out a police

3    bulletin" identifying the suspects as having been described by witnesses as Black males and giving

4    approximate height and weight ranges.) Other evidence established that the attackers wore gloves,

5    hats, and "dark nylon stockings" over their faces. (Id., slip op. at 2-3.)

6         The Court of Appeal addressed the exclusion of the statements from the two deceased

7    witnesses by determining that even if the trial court "erred in excluding the statements for the specified

8    nonhearsay purpose, we have little trouble concluding that this error was not sufficiently prejudicial

9    to warrant reversal." (Lodgment No. 6, slip op. at 25.) For purposes of federal habeas review, the only

10   question is whether the ruling "rendered the trial so fundamentally unfair as to violate due process,"

11   as "the correctness of the trial court's evidentiary ruling as a matter of state law is irrelevant." Larson,

12   515 F.3d at 1065 (citation omitted). The Court of Appeal reasonably found the quality of the police

13   investigation was "a tangential matter in the trial." (Lodgment No. 6, slip op. at 16.) The outcome of

14   the trial depended upon credibility determinations – "i.e., whether to credit the testimony of Irvin that

15   he and Ziemann committed the offense, or Ziemann's testimony that he had nothing to do with the

16   crime" and that he only told Tammy Scott that he committed the robbery, as she also testified at his

17   trial, so he would appear to be a tough guy. (Id.) A reviewing court "must respect the province of the

18   jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable

19   inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the

20   verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995); see Schell v. Witek, 218 F.3d 1017,

21   1023 (2000); Cavazos v. Smith, __ U.S. __, 132 S.Ct. 2, 3 (2011) (per curiam).

22        Ziemann challenges those evidentiary rulings on the Sixth Amendment theory that his right "to

23   present a full defense" was infringed "when the court precluded him from bringing to the jury's

24   attention that Charles Felder had confessed to two different women that he had committed the crime

25   in question," relying on Washington v. Texas, 388 U.S. 14 (1967) and Chambers v. Mississippi, 410

26   U.S. 284 (1973), among other cases. (Pet. 94, ECF No. 11.) However, as Ziemann's own discussion

27   of that authority acknowledges, those cases address the constitutional right of confrontation and to call

28   witnesses in assessing the fundamental fairness of evidentiary rulings when the excluded evidence was

1    critical to the defense and bore persuasive assurances of trustworthiness. (Pet. pp. 94-97, ECF No. 1.)

2    The Court of Appeal distinguished those cases on their facts, their procedural posture and, with respect

3    to the Chambers case, the difference in the state law evidentiary rules codified in Mississippi from

4    those in California. "Consequently, we find *Chambers* to be distinguishable and believe instead that

5    the general rule announced in that case applies here: "the accused . . . must comply with established

6    rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment

7    of guilt and innocence." (Lodgment No. 6, slip op. at 30-31, *citing* Chambers, 410 U.S. at 302.)

8        The court also observed that "Ziemann did not seek to present the testimony of any percipient

9    witness (i.e. Felder)," distinguishing Washington v. Texas, 388 U.S. 14 and noting that "Felder was

10   available to testify at trial, but apparently would simply have proclaimed his innocence as he had done

11   in a tape recorded interview with police." (Lodgment No. 6, slip op. at 28-30 ("Rather, Ziemann

12   sought to present the testimony of investigators who spoke to the now-deceased persons, who, in turn,

13   heard a statement from Felder who (purportedly) personally observed the relevant events.")

14   "Consequently, the proffered evidence consisted of two levels of hearsay:  (1) Felder's purported

15   statement to Adams/Kelly (arguably admissible as declarations against interest); and (2)

16   Adams's/Kelly's statements to investigators (not covered by any recognized hearsay exception.").)

17   Ziemann acknowledges that defense counsel was permitted "to elicit and argue, through questioning

18   or the presentation of (admissible) evidence, facts tending to show that the police failed to conduct

19   a proper investigation into the North Park Produce robbery, and to argue the possibility that two Black

20   males committed the offense," among other things, just not the "rank hearsay" of the deceased women's

21   statements. (Lodgment No. 6, slip op. at 26; *see* Pet. 87-88, ECF No. 11.)

22       As noted by Respondent, a defendant's "right to present evidence is subject to reasonable

23   restrictions, including evidentiary and procedural rules." (Ans. 32, ECF No. 19-1, *citing* Moses, 555

24   F.3d at 757; Scheffer, 523 U.S. at 308.)  Ziemann contends he "sought to admit the statements solely

25   for a nonhearsay purpose (to demonstrate the inadequacy of the police investigation), and not for their

26   truth (i.e., to show that Black males, or Charles Felder who, unlike Ziemann and Irvin, is Black,

27   committed the murder)." (Lodgment No. 6, slip op. at 24.)  The exclusion of that evidence did not

28   materially prejudice his defense in the manner asserted, as demonstrated by the Court of Appeal.

1   \\

2         For example, defense counsel established that the detective who interviewed
    Ziemann and his wife failed to follow up with a family member mentioned during the
3   interview.   Further, the defense presented evidence that the police were given
    information early in the investigation, by two separate persons, that the crime was
4   perpetrated by two Black suspects. From this evidence, the defense could argue that
    the police should have, but failed to, investigate the possibility that someone other than
5   Irvin and Ziemann committed the crime.

6   (Lodgment No. 6, slip op. at 26-27 (footnote omitted) ("Evidence that two, now-deceased witnesses

7   had provided specific information that Felder said he was the perpetrator – *admitted solely for*

8   *purposes of the jury's further evaluation of the thoroughness of the police investigation* – would have

9   done little to alter the analysis" (emphasis in original).)

10        Although he argues that the excluded statements "were not hearsay to begin with" because they

11  "were not offered to prove the truth of the matter asserted," he contradicts that argument when he states

12  that the content of the statements "would have supported his claim of innocence." (Pet. 83, ECF No.

13  11.)  Such evidence could "point[ ] to his innocence" only if the truth of the matter asserted were

14  credited, as Ziemann essentially concedes when he further represents: "Whereas the court believed

15  appellant could make his point of alleged bias by asking whether the police had another name to

16  investigate, this does not come near to conveying to the jury not only did they have other names, but

17  that there was tangible evidence that a third party had actually admitted to having committed the

18  offense in the presence of several individuals." (Id. pp. 88, 90 ("the admissions emanating from

19  Charles Felder. . . who generally fit the description of the eyewitnesses to the offense . . . reportedly

20  telling a second person he was involved.").)

21        Ziemann assumes this Court will find that exclusion of the challenged evidence violated his

22  constitutional "rights of compulsory process and due process of law" and urges the Court to apply the

23  prejudice standard of Chapman, 386 U.S. 18. (Pet. 98, ECF No. 11 ("Reversal is thus required unless

24  this court determines beyond a reasonable doubt the error did not affect the jury's verdict.").)  Not only

25  is such a finding not compelled by the record, but also the uniform standard of prejudice "in all federal

26  habeas corpus cases under § 2254" applicable to review of a state court's constitutional error is not the

27  Chapman standard but rather whether the error had a "substantial and injurious effect" on the outcome

28  of the trial.  Brecht, 507 U.S. at 623; Bains, 204 F.3d at 977; *see* Fry, 551 U.S. at 121-22.  As found

1   by the state courts, even if evidentiary error occurred, the error had minimum probative value since

2   it was not admissible to prove that Felder rather than Ziemann committed the murder.  The double-

3   hearsay nature of the excluded evidence of Felder's purported statements to the two unavailable

4   witnesses bears little indicia of reliability, and that evidence was far from crucial to his defense.

5   <u>Chambers</u>, 410 U.S. at 302.  Relief on Ground Four should be **DENIED**.

6        **G.**    **Ground Five: Fourth Amendment Violation**

7        Ziemann added a Fourth Amendment claim and an ignorance of maximum sentence claim for

8   the first time on collateral review in his complete but unsuccessful round of state habeas petitions.

9   Concerning his Ground Five claim, Ziemann contends the search of a storage facility from which

10  police seized "ammunition similar to that ammunition used in the murder, an address book and

11  footwear" violated his Fourth Amendment rights.  (Pet. 99, ECf No. 11.)  "The basis for this search

12  was not a warrant, but a parole search."  (<u>Id.</u>)  He concedes he was on parole at the time of the search,

13  but argues "he neither rented nor had access to the storage facility searched, and had no dominion or

14  control over the storage facility," which was his wife's "property or premises." (Pet. 100, ECF No. 11.)

15  "Accordingly, it was error to admit the evidence seized from storage," even though "there was no trial

16  objection, or motion to suppress . . . ."  (<u>Id.</u>)

17       The state courts rejected the claim on independent state law grounds.  The Superior Court

18  applied <u>In re Clark</u>, 5 Cal.4th 750, 765 (1993), citing *inter alia* <u>In re Dixon</u>, 41 Cal.2d 756, 759, and

19  <u>In re Walker</u>, 10 Cal.3d 764, 773 (1974), holding that "matters that 'could have been, but were not,

20  raised on a timely appeal from a judgment of conviction' are not cognizable on habeas corpus in the

21  absence of special circumstances warranting a departure from that rule." (Lodgment No. 10, slip op.

22  at 2.)  That Court found he failed to offer any reasons why the Court should deviate from the general

23  rule foreclosing review of the defaulted question.  Similarly, the Court of Appeal addressing the claim

24  on habeas review rejected his pretension to have "standing because the storage facility belonged to his

25  wife," finding "Ziemann's argument is unsupported by any documentation, and his remedy was by

26  timely pretrial motion to suppress under Penal Code section 1538.5," an independent state procedural

27  ground for rejecting the claim.  (Lodgment No. 12, slip op. at 1; *see* Lodgement No. 10, p. 3, *citing*

28  <u>In re Terry</u>, 4 Cal.3d 911, 926 (1971), <u>In re Garcia</u>, 67 Cal.App.3d 60, 66 (1977).)

1    Federal habeas relief on this claim is foreclosed by <u>Stone v. Powell</u>, 428 U.S. 465 (1976),

2    holding that "where the State has provided an opportunity for full and fair litigation of a Fourth

3    Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas

4    corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was

5    introduced at his trial." <u>Stone</u>, 428 U.S. at 481. The Ninth Circuit has read <u>Stone</u> "as a categorical

6    limitation on the applicability of Fourth Amendment exclusionary rules in habeas corpus proceedings."

7    <u>Woolery v. Arave</u>, 8 F.3d 132, 1328 (9th Cir. 1993). A federal habeas court reviewing such a claim

8    only looks to see whether the petitioner had the opportunity to litigate his Fourth Amendment claim

9    in state court, not whether the petitioner actually litigated the claim nor whether the claim was decided

10   correctly. (*See* Ans. 33, ECF No. 19-1, *citing* <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir.

11   1996); *see* <u>Gordon v. Duran</u>, 895 F.2d 610, 613-14 (9th Cir. 1990) (finding that Cal. Penal Code §

12   1538.5 provides the opportunity in state court for "full and fair litigation" of a Fourth Amendment

13   claim and that the Constitution does not require habeas corpus relief "on the ground that evidence

14   obtained in an unconstitutional search or seizure was introduced at [petitioner's] trial"), *quoting* <u>Stone</u>,

15   428 U.S. at 481-82. "Petitioner's argument goes not to the fullness and fairness of his opportunity to

16   litigate the claim, but to the correctness of the states court resolution, an issue which *Stone v. Powell*

17   makes irrelevant." <u>Siriprongs v. Calderon</u>, 35 F.3d 1308, 1321 (9th Cir. 1994) (citation omitted).

18   Accordingly, relief on Ziemann's Ground Five must be **DENIED**.

19   **H.    Ground Six: Ignorance Of Maximum Sentence Exposure**

20   Ziemann represents that when the complaint was initially filed, "the charge did not include

21   special circumstances, and the possible sentence was 25 to life," but "the Amended Information filed

22   on June 5, 2006 delineates the maximum sentence as being either life or death." (Pet. 101, ECF No.

23   11.) He declares he "was never given a copy of the complaint or information in this case and therefore

24   never read about the maximum sentence [he] was facing," believing he "was facing a sentence of 25-

25   years to life, and that [he] would be eligible for parole." (Pet. 171, Exh. H, ECF No. 11.)

> The defendant argues his lawyer never told him he was facing life without parole. A
> family member would testify she was advised the maximum was 25 years to life.
> Exhibit "G" [Margaret Linares' March 2008 Declaration]. The Defendant would also
> testify he was advised the maximum sentence was 25 years to life. Exhibit "H"
> [Ziemann's March 2008 Declaration]. The trial attorney, Mr. Haddad, vehemently

1      disputes this and indicates he advised the defendant of the maximum sentence possible, and that as part of his legal duties he met with and talked with the District Attorney
2      about dropping the death penalty.

3  (Pet. 101, ECF No. 11, 167-68, 170-171; Lodgment No. 1, CT vol. 1, 0151, 0154-0155, 0174-0175.)

4        Ziemann stated the claim in his state habeas petitions as "he was unaware that the maximum

5  sentence he faced was life without the possibility of parole and had he known, he would have entered

6  a plea bargain to 25 years to life in prison," a claim both the state Superior Court (Lodgment No. 10)

7  and the California Court of Appeal (Lodgment No. 12) addressed on the merits in their decisions

8  denying him collateral relief.[5]  In rejecting this claim, the Court of Appeal, like the Superior Court,

9  relied on a lack of evidence that the State did or would have offered Ziemann a negotiated plea deal,

10  finding the contention to be entirely speculative and conclusory.  (Lodgment No. 12, slip op. at 2.)

11      Ziemann concedes "the records do not contain any discussion of possible plea bargains or maximum sentences." His argument is speculative and there is no evidence in the
12      record regarding a negotiated plea. Ziemann has not shown he is entitled to relief on habeas corpus.
13

14  (Lodgment No. 12, p. 2; *see also* Lodgment No. 10, p. 4: "Petitioner has not shown that the People

15  would have, or did, offer him a plea deal which included a sentence more favorable than life without

16  the possibility of parole.")

17      Petitioner has submitted two declarations in his [*sic*] support of his claim that he was never informed of the possible maximum sentence:  his own declaration and
18      that of his aunt.  [¶]  Petitioner declares that he was never made aware that he was facing life without parole. Petitioner's declaration is contradicted by his own *verified*
19      petition in which he acknowledges that his attorney disputes the claim Petitioner was never informed of the possible maximum sentence. Petitioner has not submitted any
20      objective, relevant, documentation which would permit this court to resolve the dispute in Petitioner's favor.  The declaration of Petitioner's aunt indicates only that *she*, not
21      Petitioner, was informed that Petitioner was facing a sentence of 25 to 35 years to life as a result of his conviction.

22      Petitioner has not cited any authority holding that a third party's belief as to Petitioner's sentencing possibilities is determinative in a dispute in that context.
23      Moreover, Petitioner does not indicate that his aunt communicated her belief to him or that it influenced his decisions in the case.  Indeed, it is difficult to envision how that
24      could be the case since the aunt's declaration indicates the communication was made *after* the conviction was rendered; thus, the time for plea bargaining had long expired.
25

26  (Lodgment No.10, slip op. at 3-4.)

---

27    [5] Despite the conclusory brevity of Ziemann's articulation of this claim in his federal Petition (Pet. 101, ECF No. 11), the Court has verified the statement of the claim is complete and identical to the manner
28  in which it was presented at all three levels of state collateral review.  (*See* Lodgment No. 9, p. 84, Lodgment No. 11, p. 84, and Lodgment No. 13, p. 84.)

11cv2496-BEN(KSC)

1    The Fifth Amendment protects the right of an accused not to plead guilty, Brady v. United

2  States, 397 U.S. 742, 746 (1970), but the Constitution accords no right to receive an offer of plea

3  negotiations or a plea bargain, Santobello v. New York, 404 U.S. 257, 261-62 (1971). *See* Buckley

4  v. Terhune, 441 F.3d 688, 694 (9th Cir. 2006). Although a criminal defendant has a federal due

5  process right to enforce the terms of a plea agreement, a criminal defendant has no constitutional right

6  to plead guilty in exchange for sentencing concessions. *See* North Carolina v. Alford, 400 U.S. 25,

7  38 n.11 (1970). The right to plead guilty is governed by statute. Id. at 38-39; *see* Cal. Penal Code §§

8  859a, subd. (a), 1018). The Supreme Court "has necessarily accepted as constitutionally legitimate

9  the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to

10  forego his right to plead not guilty." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). It does not

11  follow that the prosecutor *must* attempt to persuade the defendant to do so. The prosecutor need not

12  engage in plea bargaining, "if he prefers to go to trial" in the exercise of his or her broad discretion.

13  Weatherford v. Bursey, 429 U.S. 545, 561 (1977)).

14    The state reviewing courts did not address this issue by applying ineffective assistance of

15  counsel ("IAC") standards, a claim which Respondent acknowledges is "implicit" in Ziemann's

16  assertion that if his attorney had advised him of the maximum prison exposure he faced prior to trial,

17  he would have entered a negotiated plea (Ans. 33, ECF No. 19-1), and which was a primary focus of

18  the trial court's post-trial treatment of that issue (Lodgment No. 2, RT vol. 12). Even if the Court were

19  to reach the IAC issue, Ziemann fails to satisfy the standards required for relief under that theory.

20    A defendant claiming IAC must show both (1) deficient performance under an objective

21  standard of reasonableness and (2) prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984).

22  To satisfy the deficient performance requirement, "[t]he challenger's burden is to show 'that counsel

23  made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by

24  the Sixth Amendment.' " Richter, 131 S.Ct. at 787, *quoting* Strickland, 466 U.S. at 687. To

25  demonstrate prejudice, the petitioner must show that "but for counsel's unprofessional errors," there

26  is a reasonable probability "the result of the proceeding would have been different." Strickland, 466

27  U.S. at 690. "A reasonable probability is a probability sufficient to undermine confidence in the

28

1   outcome." Id. at 694; see Richter, 131 S.Ct. at 792 ("The likelihood of a different result must be

2   substantial, not just conceivable"). "Because failure to meet either [Strickland] prong is fatal to [an

3   IAC] claim, there is no requirement that we 'address both components of the inquiry if the defendant

4   makes an insufficient showing on one.' " Gonzalez v. Wong, 667 F.3d 965, 987 (9th Cir. 2011),

5   quoting Strickland, 466 U.S. at 697; see Bell v. Cone, 535 U.S. 685, 694 (2002) ("Without proof of

6   both deficient performance and prejudice to the defense . . . the sentence or conviction should stand")

7   (citation omitted).

8       Not only does Ziemann identify no portion of the evidentiary record to substantiate his

9   purported misunderstanding of his maximum sentence exposure that caused him to forego an actual

10  opportunity to negotiate a plea, but also the record contains considerable contrary evidence, including

11  sworn testimony elicited from Ziemann's trial counsel in connection with post-trial proceedings.  In

12  connection with a new trial motion, substitute defense counsel communicated to the court:

13          Well, Mr. Haddad represented – I did contact Mr. Haddad, and I put in my
            pleadings that he said that, in effect, that his offer of proof is that it's not true; that, as
14          a matter of fact, [he] went to the District Attorney, Ms. Dumanis, to speak personally
            with her about getting the death penalty dropped.   Therefore, based on his
15          representations, Mr. Ziemann was aware of the maximum sentence because it started
            off at the death penalty.
16
17          I submit to the court that the two informations, one of them show, originally,
            that it was not a life without parole case, and the second one indicated that it was. Mr.
18          Ziemann submitted a declaration saying what the facts were; his mother-in-law
            submitted a declaration. There wasn't any response. But that's the state of the record.
19          I know Mr. Ziemann has raised the issue and has submitted in support of that,
            the declaration of the family member who said he [sic] was told the maximum sentence
20          was 25 or 25 to life, I think, and not life without parole. So the issue has been tendered
            in that respect.
21
22  (Lodgment No. 2, RT vol. 12, pp. 1646; see also id. pp. 1667-1670, 1672-1676.)

23      The issue of alleged failure to advise of the maximum penalty was taken up again after

24  additional briefing on May 30, 2008, just before sentencing. Trial counsel, who had been Ziemann's

25  retained attorney from the initial arraignment through the jury verdict, testified "on the issue of

26  whether or not he explained to [Ziemann] what the punishment and penalties would be." (Lodgment

27  No. 2, RT vol. 12, pp. 1680-1681.) The Court excluded "tangential" issues "about whether or not an

28

1   offer was made to Mr. Ziemann or from Mr. Haddad to Mr. Ziemann from the district attorney and the

2   proper trial strategy regarding prior consistent and inconsistent statements," with "the only issue . . .

3   [being] whether or not the maximum penalty was explained to him." (Id.)

4   > Q: At any point during your representation of Mr. Ziemann in this case, did you inform
    > Mr. Ziemann of the maximum penalty that he was facing if convicted on all counts?

5

6   > A: Yes.

7   > Q: Approximately when was that?

8   > A: . . . [D]uring the preliminary hearing [held October 25, 26, 27, 2005] and after the
    > preliminary hearing, I spoke with Mr. Ziemann . . .; told him that your office is going
    > to make a determination whether to seek the death penalty or not, and that I would have

9   > to go up there and speak to them to try to convince them not to plead the death penalty.
    > [¶]  And if they did not plead the death penalty, then it would be life imprisonment

10  > without the possibility of parole. That's the specific time that we spoke about it. . . .
    > [¶] . . . It was in person.  It was when you first spoke about it.  And, after the

11  > preliminary hearing, I told him what you were talking about, about the death penalty.
    > And the only alternative would be you would seek life in prison.

12  > Q: Without the possibility of parole?

13

14  > A: Without the possibility of parole.

15  > Q: Was that in relation to the filing of special circumstance allegations?

16  > A: That's the only way it came up, because of what you had said, what you informed
    > the court and counsel at the time.

17  > Q: And, by that, you mean that, during the preliminary hearing, I had informed the
    > court and defense counsel that, at the conclusion of the preliminary hearing, the District

18  > Attorney would be filing special circumstances allegations?

19  > A: That's correct.  And that we would have to come up and persuade the District
    > Attorney . . . as to why not to file the death penalty.  And then, in the alternative, that

20  > would leave life imprisonment without the possibility of parole.

21  > Q: Do you recall how many times it was that you told Mr. Ziemann that the maximum
    > penalty, if death was not sought by the D.A., would be life without the possibility of

22  > parole?

23  > A: . . . That was the only specific time we discussed that.  Every time thereafter, . . .
    > when I would approach him about the possibility of trying to work out a disposition,

24  > he would say, "No. I'm not guilty. I don't want no disposition." [¶]  And I says, "Well,
    > if you get found guilty, you will spend the rest of your life in jail."  That was it.  There

25  > was no specific – other than the specific time at the preliminary hearing, there was no
    > specific. [sic]

26
    (Lodgment No. 2, RT vol. 12, pp. 1682-1687.)  His trial counsel added:
27

28

Q: Final question. Was there ever a plea offer in this case?

A: There was no – there was never a plea offer given. What there was, was, on several occasions, I had spoken to counsel for the District Attorney, and he said, "Would your client consider any kind of disposition in this matter?"  [¶]  And I said to him, "My client says he is not guilty." And then I would come back to Mr. Ziemann, and I would say, "The District Attorney wants to know if you are interested in any kind of a plea bargain." He would say, "I'm not guilty. I'm not pleading to nothing, okay?"

That would be the extent of it.  Then, when we got sent out to trial in this department, we had motions in limine. And, in the course of those motions in limine, or after them, we had a discussion between Mr. Kirvin [the prosecutor], myself, and the judge. And the judge said, "You know, you guys ought to try to resolve this thing."

And I would say, "I would resolve it for a manslaughter." So the judge says, "Come on. Be realistic." And we would talk about it. The judge indicated something in the mid to high twenties. He says, "Go talk to Mr. Ziemann."

Mr. Kirvin would say, "I'm not making an offer," and the judge would say, "Go talk to Mr. Kirvin." And I told the judge and Mr. Kirvin, "He's not going to take anything." But I came back out here, in response to this conversation that we had in chambers – in fact, it was in the presence of the bailiff at that time.

I said to him, "The judge thinks that you may consider a deal, maybe somewhere in the mid to high twenties," you know, "Would you consider that? So then I can tell him, and Mr. Kirvin can go to his office and see if they approve it."

He says, "I'm not pleading. I'm not guilty." And that was in the presence of the bailiff. . . .

(Lodgment No. 2, RT vol 12, pp. 1688-1689.)  The court further clarified the record with counsel:

THE COURT:  You told them, in this case, "Bring me something to offer."  Did the D.A. say, "We're not offering.  Bring me something, and I will run it up the food chain"?

THE WITNESS:  That's basically it.  Counsel for the District Attorney never specifically made any offer.  He says, "If there is something you want to discuss, give it to me, and I will run it through."
. . .

THE COURT:  . . . If I'm hearing you right . . . on the date of the preliminary examination, or sometime during the preliminary examination, Mr. Kirvin is prosecuting the matter, and he says, "Prelim Judge, by the way, we're entertaining special circumstances here," Okay?  To put it in issue so that you can lay down the record.  [¶]  No determination has been made whether it will be life without parole, special circumstance, or death penalty, special circumstance. I'm right so far? Right?

THE WITNESS: Yes. I believe so.
. . .

THE COURT:  It took place in the presence of Mr. Ziemann?

1  THE WITNESS: Yes. That's correct.

2  THE COURT: If I hear you correctly, . . . based on that, Mr. Ziemann is, metaphorically, tugging at your shirt sleeves, "What are you talking about there?" And
3  you tell him what the special circumstance means?

4  THE WITNESS: Metaphorically. . . .[¶] I have to tell him what they are talking about. I specifically talked to him about that.
5

6  THE COURT: . . . When you told him it was life without parole, the context of speaking about special circumstance, and it was after the D.A. mentioned it to the judge after the preliminary examination. . . . [¶] Based on what was said to the judge,
7  counsel, yourself, you felt it was your obligation to explain it to Mr. Ziemann . . . .[¶] And what special circumstances means. You told him it was life without or death, and
8  the D.A. had to make the decision about that.

9  THE WITNESS: I had to go up there and convince them not to file the death penalty.

10  (Lodgment No. 2, RT vol. 12, pp. 1690-1693.)

11      The lodged record provides other indices undermining Ziemann's claim he was ignorant of his

12  maximum sentence. This Court's reading of all the iterations of the murder charge reveal it involved

13  special allegations expressly indicating Ziemann was facing a no-probation life sentence or even a

14  death sentence if convicted. Ziemann's asserts that he never "saw" the five-count Complaint filed

15  February 10, 2005 (Lodgment No. 1, CT vol. 1, 0001-0011) on which he was arraigned on February

16  14, 2005. He claims he never saw the Information (id. 0014-0024) on which both he and Irvin were

17  arraigned on November 21, 2005 (id. CT vol. 1, 0210) and which contained the same charges and

18  allegations as the Complaint, including among other things, the Cal. Penal Code § 187(a) murder, a

19  felony standing alone which carries a "Sentence Range" of "25 Yrs.-Life." (Lodgment No. 1, CT vol.

20  1, 0014.) Seven special allegations were again listed as associated with that charge, each of which,

21  if proved, would add additional time or have other effects enhancing the base sentence for a murder

22  conviction. (Id.) The sixth of those Special Allegations (Cal Penal Code § 1203.06(a)(1)) states the

23  "Allegation Effect" as "No Probation," and the seventh Special Allegation (Cal. Penal Code §

24  190.2(a)(17)) states the "Allegation Effect" as "Life/Death." (Id.) The June 5, 2006 Amended

25  Information (id. 0025-0031) eliminated certain original charges but retained the same murder count

26  and the same seven "Special Allegations" against Ziemann as in the Information, including the

27  allegation carrying the express effect of "No Probation" and the allegation carrying the express effect

28

1    of "Life/Death." (Id. CT vol. 1, 0025.)  In addition, this Court's review of the Clerk's Transcript also

2    reveals that Ziemann and Irvin were personally present at a pre-trial status conference on January 27,

3    2006, where the minutes include the subject matter notation:  "Court and counsel discuss:  Decision

4    as to Life/Death has not yet been made by the People."  (Lodgment No. 1, CT vol. 4, 0877.)

5            Even if defense counsel had failed to inform Ziemann of his maximum potential sentence, a

6    claim belied by counsel's sworn testimony, in the absence of any plea negotiation offer from the

7    prosecution, Ziemann has shown no "reasonable probability" of a more favorable outcome he lost due

8    to that allegedly deficient performance. Strickland, 466 U.S. at 690, 694.  Moreover, as Respondent

9    observes, Ziemann actually "equivocates as to whether he would have accepted a plea offer, even if

10   one were offered" (Ans. 35, ECF No. 19-1) when he states:  "If I had been advised the maximum

11   sentence upon conviction was life without parole, *I might've accepted* a plea agreement." (Pet. 171,

12   Exh. H, Ecf No. 11.) His own Declaration thus undermines his claim. Lockhart v. Fretwell, 506 U.S.

13   364, 372 (1993) (the focus of the prejudice component of the prejudice component of a Strickland

14   claim addresses "the question whether counsel's deficient performance renders the result of the trial

15   unreliable or the proceeding fundamentally unfair").

16           It is recommended the Court find no basis to disturbing the state court result on this ground.

17   The result was not contrary to nor an unreasonable application of controlling United States Supreme

18   Court authority, and the required deference to the state court's objectively reasonable factual findings

19   foreclose federal habeas relief.  Ground Six should be **DENIED**.

20       **I.    Miscellaneous Allegations**

21           In his Traverse, Ziemann argues that he is "actually innocent" of the crimes of which he was

22   convicted. (Traverse 16, ECF No. 22.) He also contends that "unless the court reverses his conviction

23   a 'miscarriage of justice' will result."  (Id.)   Finally, he "asserts that the cumulative effect of

24   constitutional violations led to a trial so fundamentally unfair, that no reasonable judge or jury would

25   have found Petitioner guilty of the underlying offense." (Id. 8, 16.)

26           Ziemann's actual innocence claim is an unelaborated and conclusory statement, relying on no

27   authoritative standard of review or appropriate evidentiary support. Similarly, his bare contention that

28

31                                      11cv2496-BEN(KSC)

1   a miscarriage of justice will accompany a denial of his Petition is unsupported by any legally

2   cognizable demonstration.   Vague allusions to constitutional violations fail to satisfy AEDPA

3   standards.  28 U.S.C. § 2254(d)(1).

4              Concerning his "cumulative error" argument, the Ninth Circuit recognizes the possibility that

5   the combined effect of discrete trial errors, when none of them individually warrants relief, can be

6   found to have had a substantial and injurious effect on the jury's verdict.

7        The Supreme Court has clearly established that the combined effect of multiple trial
         court errors violates due process where it renders the resulting criminal trial
8        fundamentally unfair.   *Chambers*, 410 U.S. at 298, 302-03 (combined effect of
         individual errors "denied [Chambers] a trial in accord with traditional and fundamental
9        standards of due process" and "deprived Chambers of a fair trial"). The cumulative
         effect of multiple errors can violate due process even where no single error rises to the
10       level of a constitutional violation or would independently warrant reversal. *Chambers*,
         410 U.S. at 290 n. 3.

11

12  Parle v. Runnels, 505 F.3d 922, 927 (9th  Cir. 2007) (footnotes and parallel citations omitted); *see*

13  *also, e.g.,* Phillips v. Woodford, 267 F.3d 966, 985-86 (9th Cir. 2001) ("We consider the cumulative

14  prejudicial effect of multiple trial errors in determining whether relief is warranted"), *citing* Mak v.

15  Blodgett, 970 F.2d 614, 622 (9th Cir.1992) (per curiam); Alcala v. Woodford, 334 F.3d 862, 882-83

16  (9th Cir. 2003) (holding that the combined prejudice of multiple trial errors deprived the petitioner "of

17  a fundamentally fair trial and constitutes a separate and independent basis for granting his petition").

18             Ziemann's cumulative error claim presupposes that the Court would find that constitutional

19  error occurred in connection with at least two of his claims.  Only "substantial" errors which do not

20  warrant relief standing alone are amenable to assessment for their combined prejudicial effect on the

21  fairness of a trial. Calderon v. Coleman, 525 U.S. 141, 145 (1998); *see* Hayes v. Ayers, 632 F.3d 500,

22  524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no

23  cumulative prejudice is possible.  See United States v. Larson, 460 F.3d 1200, 1217 (9th Cir.2006)

24  (rejecting cumulative error claim where we 'discovered no error' in the defendants' trial")). Ziemann

25  has not established that at least two substantial trial errors occurred which, considered in combination,

26  overcome their failures individually to satisfy the Brecht, 507 U.S. at 623, prejudice standard.  None

27  of Ziemann's arguments in his Traverse support disturbing the state court result.

28

J.     **Request For Appointment Of Counsel**

Finally, Ziemann includes in his Petition filing a Motion And Declaration For Appointment Of Counsel dated September 15, 2011, signed by Ziemann but apparently prepared on his behalf by a fellow inmate, that does not appear from the docket to have been addressed. (Pet. 137-138, ECF No. 11.) He represents there that he is illiterate and has mental health issues. (Id. p. 138.)

Every defendant has an absolute right to counsel on direct appeal from a conviction, but there is no constitutional right to appointment of counsel in state or federal collateral proceedings. Coleman, 501 U.S. at 756-57; see Pennsylvania v. Finley, 481 U.S. 551, 555-56 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions"). Nevertheless, when a federal court "determines that the interests of justice so require, representation may be provided for any financially eligible person who" is seeking relief under 28 U.S.C. § 2254; see Bashor v. Risley, 730 F.2d 1228, 1234 (9th Cir. 1984) (the appointment of counsel to represent an indigent petitioner collaterally attacking a conviction is discretionary with the court, unless an evidentiary hearing is necessary, in which case appointment of counsel is mandatory); see also Rules Governing § 2254 Cases, Rule 8(c). Factors the Court considers in exercising its discretion include the factual or legal complexity of the petition, the likelihood of success on the merits, and the petitioner's understanding of issues and capability to investigate and to present the claims himself. See LaMere v. Risley, 827 F.2d 622, 626 (9th Cir. 1987) (no abuse of discretion to deny appointment of counsel when district court pleadings demonstrated petitioner's "good understanding of the issues and the ability to present forcefully and coherently his contentions").

Ziemann's Petition extensively articulates his claims, incorporating arguments and authority previously presented in the state courts, none of which presents any unusual factual or legal complexity. No evidentiary hearing or other remaining federal proceeding requiring the assistance of counsel is warranted in his case. It is recommended the Motion be **DENIED**.

For all the foregoing reasons, it is recommended the Court find that the state courts' rejection of all Ziemann's federal claims comports with controlling United States Supreme Court authority and is objectively reasonable, foreclosing federal habeas relief. 28 U.S.C. § 2254(d). The Court should

1  **DENY** the Petition in its entirety, as Ziemann is not in custody in violation of federal law.  28 U.S.C.
2  § 2254(a).

3  **III.    CONCLUSION AND RECOMMENDATION**

4        The Court submits this Report and Recommendation to United States District Judge Roger T.
5  Benitez under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court
6  for the Southern District of California.  For all the foregoing reasons, **IT IS RECOMMENDED** this
7  habeas Petition be **DENIED** on the grounds that Petitioner is not in custody in violation of any federal
8  right.  **IT IS FURTHER RECOMMENDED** that both Petitioner's request for an evidentiary hearing
9  and his request for appointment of counsel be **DENIED**.  **IT IS FURTHER RECOMMENDED** the
10  Court issue an Order (1) approving and adopting this Report and Recommendation and (2) directing
11  that judgment be entered denying the Petition.

12        **IT IS HEREBY ORDERED** no later than **November 19, 2012**, any party to this action may
13  file written objections with the Court and serve a copy on all parties.  The document should be
14  captioned "Objections to Report and Recommendation."

15        **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and
16  served on all parties no later than **November 30, 2012**.  The parties are advised that failure to file
17  objections within the specified time may waive the right to raise those objections on appeal of the
18  Court's Order.  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d
19  1153, 1157 (9th Cir. 1991).

20

21  **DATED:** 10/30 , 2012

22                     HON. KAREN S. CRAWFORD
                   UNITED STATES MAGISTRATE JUDGE

34

11cv2496-BEN(KSC)